<u>NOT FOR PUBLICATION</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

———————————————————
                              :

DEBORAH S. CONOVER,      :
                              :

      Plaintiff,        :         Civil No. 13-6413 (RBK)
                              :

      v.               :         **OPINION**
                              :

CAROLYN W. COLVIN,       :
ACTING COMMISSIONER OF  :
SOCIAL SECURITY,        :
                              :

      Defendant.       :
———————————————————:

**KUGLER**, United States District Judge:

      This matter comes before the Court upon the appeal of Deborah S. Conover ("Plaintiff") for the review of the decision by the Administrative Law Judge ("ALJ") denying her claim for a period of disability and Disability Insurance Benefits ("DIB"), pursuant to Section 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g).  For the reasons set forth below, the decision of the Commissioner is affirmed.

## I.   BACKGROUND

### A.  Procedural History

      On January 4, 2010, Plaintiff protectively filed an application for a period of disability and DIB under Title II of the Act, alleging disability beginning September 19, 2009.  (Tr. at 128-34.)  Plaintiff's application was denied initially and on reconsideration.  (<u>Id.</u> at 72-73, 76-80, 81-84.)  On February 22, 2011, Plaintiff requested a hearing before an ALJ.  (<u>Id.</u> at 85.)  Plaintiff appeared before ALJ Daniel Shellhamer on February 22, 2012.  (<u>Id.</u> at 39-71.)  On March 22,

2012, the ALJ found that Plaintiff was not disabled within the meaning of sections 216(i) and

223(d) of the Act between Plaintiff's alleged disability onset date of September 19, 2009, and the

date of the ALJ's decision.  (Id. at 18-38.)  Plaintiff's request for review by the Appeals Council

was filed on May 21, 2012.  (Id. at 13-14.)  On September 18, 2013, the Appeals Council denied

Plaintiff's request for review.  (Id. at 1-5.)  Thus, the ALJ's decision on March 22, 2012, became

the final decision of the Commissioner.  Plaintiff filed this action pursuant to 42 U.S.C. § 405(g),

seeking district court review of the ALJ's decision.

### B.  Plaintiff's Medical History

#### 1.      Medical Record

In 2007, Plaintiff was in a motor vehicle accident.  (Tr. at 58.)  Plaintiff's medical record

indicates that, after the accident, Plaintiff suffered from lumbar degenerative disc disease and

radiculopathy, cervical degenerative disc disease and radiculopathy, carpal tunnel syndrome,

migraine headaches, depression, and bipolar disorder.  (Id. at 215-59, 270-17, 319-22, 371-85,

424-32, 450-51, 453-58, 528-69, 631-33.)

##### i.      Lumbar Degenerative Disc Disease and Radiculopathy

On March 13, 2006, Plaintiff's most recent imaging studies, conducted January 30, 2006,

revealed mild spinal stenosis at the L3-4 vertebral level.  (Id. at 258.)  Mild Grade 1

spondylolisthesis and mild annular disc bulging were also noted at the L5-S1 level.  (Id.)

Imaging of Plaintiff's lumbar spine was performed again on October 27, 2007, and revealed S-

shaped thoracolumbar scoliosis, which was convex to the right at T8-9.  (Id. at 450.)

Additionally, mild spondylosis and discogenic disease were noted at the mid-thoracic level.  (Id.)

On December 20, 2007, an MRI of Plaintiff's lumbar spine was performed and revealed disc

desiccation and minimal facet arthrosis at L1-2, a mild disc bulge and minimal facet arthrosis at

L2-3, a disc bulge with slight accentuation toward the left resulting in moderate narrowing of the left lateral recess and the left neural foramen, mild right neural foramen narrowing, facet arthrosis and lagmentum flavum hypertrophy resulting in moderate canal stenosis at L3-4, a mild disc bulge and minimal facet arthrosis without significant central canal stenosis or neural foraminal narrowing at L4-5, and a minimal disc bulge without central canal stenosis or neural foraminal narrowing at L5-S1.  (Id. at 459-60.)

On March 6, 2008, Plaintiff presented to her chiropractor, Dr. Barry Rizzo, who noted Plaintiff's lumbar spine was unremarkable with regard to examination.  (Id. at 587.)  On December 17, 2008, Plaintiff had pain bilaterally in her lumbar spine area and had a negative straight leg-raising test.  (Id. at 231.)  Plaintiff was diagnosed with lumbar discogenic disease, lumbar spinal stenosis, and sacroiliac pain on the left.  (Id.)  Alice Jones, N.P., prescribed Plaintiff Hydrocodone.  (Id.)

On January 19, 2009, Plaintiff complained of pain in her lumbar spine and paraspinal muscles.  (Id. at 219.)  Plaintiff's straight leg-raising test was negative and she ambulated without assistive device.  (Id.)  Plaintiff was given Hydrocodone.  (Id.)  On June 11, 2009, Plaintiff saw Ms. Jones who noted Plaintiff was stable with no new concerns.  (Id. at 206.)  Plaintiff told Ms. Jones she was looking for employment.  (Id.)  On September 10, 2009, Plaintiff reported that her pain was a 5 out of 10 and that she had found a new job.  (Id. at 211.)  On October 9, 2009, Plaintiff was stable with no new concerns.  (Id. at 213.)  She had tenderness in the bilateral lumbar area. Plaintiff indicated her pain was a 5 out of 10.  (Id.)  On November 12, 2009, an electromyogram ("EMG") revealed chronic L5 radiculopathy.  (Id. at 316.)

On February 1, 2010, Plaintiff measured her pain as a 5 out of 10.  (Id. at 201.)  Plaintiff was taking Percocet for pain.  (Id.)  Diana Hewlett, APN-C, noted pain and tenderness in

Plaintiff's bilateral lumbar spine with a bilateral positive straight leg-raising test.  (Id.)  On February 4, 2010, Dr. Carabelli noted attempts to wean Plaintiff off her medication resulting in difficulty with daily activities.  (Id. at 270.)  On September 6, 2010, Plaintiff was treated at AtlantiCare Regional Medical Center ("AtlantiCare") after falling down.  (Id. at 409.)  Plaintiff reported back pain, but ambulated without assistance.  (Id.)  On September 20, 2010, Dr. Carabelli determined Plaintiff was in moderate distress and was diffusely tender in her spine with mild to moderate spasms.  (Id. at 426.)  Plaintiff's range of motion was within functionally normal limits.  (Id.)

On January 24, 2011, Plaintiff told Dr. Carabelli her pain was a 7 to 8 out of 10.  (Id. at 429.)  Dr. Carabelli recommended an exercise program and non-pharmalogical methods of pain control.  (Id.)  Dr. Carabelli noted Plaintiff was diffusely tender in her lumbar spine, had a positive straight leg-raising test, and a reduced range of motion.  (Id.)  Plaintiff agreed to wean down on her medications to determine the need for medications.  (Id.)

### ii.    Cervical Degenerative Disc Disease and Radiculopathy

On December 20, 2007, an MRI of Plaintiff's cervical spine was performed and revealed disc desiccation without disc herniation, central canal stenosis, or neural foraminal narrowing at C2-3 and C3-4, disc desiccation without disc herniation or central canal stenosis, but with uncovertabral hypertrophy resulting in mid left neural foraminal narrowing at C4-5, a disc bulge without significant central canal stenosis or neural foraminal narrowing at C5-6, and disc desiccation without disc herniation, central canal stenosis or neural foraminal narrowing at C6-7 and C7-T1.  (Id. at 460.)

On March 6, 2008, Plaintiff saw Dr. Rizzo who examined Plaintiff.  (Id. at 587.)  Plaintiff reported severe neck pain radiating to the right arm and hand.  (Id.)  Plaintiff's middle finger,

fourth finger, and fifth finger had become numb with electric sensations.  (Id.)  Prior to this visit,

Plaintiff had been doing well, was no longer taking pain medication aside from anti-

inflammatories, and had begun physical therapy.  (Id.)  Plaintiff believed that doing too much in

physical therapy caused her pain.  (Id.)  Plaintiff exhibited a reduced range of motion.  (Id.)

Neurological examination revealed hypoesthesia in the right C7 distribution and to a lesser

degree in the C8 distribution.  (Id.)  Plaintiff had a marked positive cervical compression on the

right and positive cervical distraction test.  (Id.)  Dr. Rizzo noted a positive Spurling's test and

the electric sensations Plaintiff experienced were worse going into the right arm with this test.

(Id.)  Dr. Rizzo determined that Plaintiff's C6 disc bulge may have worsened and he stopped

physical therapy until Plaintiff could undergo an MRI.  (Id.)

On March 18, 2008, an MRI of Plaintiff's cervical spine revealed a right paracentral mild

to moderate sized herniated disc at the C5-C6 level associated with asymmetrical neuroforaminal

encroachment.  (Id. at 513-18.)  On May 1, 2008, Dr. Henry Sardar reviewed Plaintiff's March

2008 MRI.  (Id. at 244.)  Plaintiff's motor strength in the upper extremities was a 4/5 on the right

and a 4+/5 on the left.  (Id.)  Plaintiff's functional range of motion and motor coordination were

normal. (Id.)  Plaintiff was diagnosed with cervical discogenic disease and myofascial pain

syndrome and was prescribed Oxycodone.  (Id.)  On June 2, 2008, Dr. Rizzo determined Plaintiff

was no longer a candidate for chiropractic care and discharged her.  (Id. at 611.)  Dr. Rizzo

recommended that Plaintiff see a neurosurgeon.  (Id.)  On June 30, 2008, Dr. Rizzo encouraged

Plaintiff to undergo surgery, as it was her only option given the progressive nature of her

neurologic findings.  (Id. at 615.)

On September 10, 2008, Dr. Andrew Glass performed a C5-6 cervical discectomy and

instrumented arthrodesis.  (Id. at 231.)  Plaintiff experienced one hundred percent pain relief

following surgery.  (Id.)  A March 13, 2009, MRI revealed post-operative changes, but no other

abnormalities.  (Id. at 629.)

On June 11, 2009, Plaintiff saw Ms. Jones who noted Plaintiff was stable with no new

concerns.  (Id. at 206.)  Plaintiff told Ms. Jones she was looking for employment.  (Id.)  On

September 10, 2009, Plaintiff reported that her pain was a 5 out of 10 and that she had found a

new job.  (Id. at 211.)  On October 28, 2009, Plaintiff reported increasing cervicalgia with right

dorsal upper extremity radicular pain to Dr. Glass. Tr. 264. Dr. Glass observed Plaintiff's

cervical range of motion was moderately restricted.  (Id.)  She had full strength in her upper

extremities.  (Id.)  On November 7, 2009, Dr. Glass reviewed a cervical MRI from November 4,

2009, which revealed post-surgical changes with instrumented arthrodesis at C5-6 and mild disc

bulging at C4-5 and C6-7.  (Id. at 263.)  The MRI also showed minimal degenerative changes of

the uncovertebral joints with minimal left sided foraminal stenosis at C3-4, degenerative changes

of the facet joints with mild bilateral neural foraminal stenosis and minimal canal stenosis at C4-

5.  (Id. at 633.)

On December 10, 2009, an EMG revealed Plaintiff suffered chronic, bilateral C6

radiculopathy.  (Id. at 314-15.)  On December 17, 2009, Dr. Carabelli noted that Plaintiff

required a small amount of Oxycodone and Hydrocodone to control her pain.  (Id. at 270.)

On January 18, 2010, Plaintiff was treated at AtlantiCare for cervical radiculopathy and

pain. Plaintiff had moderate tenderness at C1-C7.  (Id. at 375-80.)  Plaintiff complained of

numbness and paresthesia of the left hand, right arm, and left arm.  (Id.)  Plaintiff had moderate

pain with cervical range of motion, her strength was reduced at 3/5 in the left arm, and her pain

was rated a 6 out of 10.  (Id.)  Plaintiff was prescribed Percocet.  (Id.)  On February 1, 2010,

Plaintiff's pain was a 5 out of 10.  (Id. at 201.)  Plaintiff was seen again at AtlantiCare on April

19, 2010, and June 21, 2010, for neck and arm pain.  (Id. at 387-07.)  Plaintiff was prescribed

Motrin and Percocet.  (Id.)  On September 20, 2010, Dr. Carabelli determined Plaintiff was in

moderate distress and experienced decreased sensation in her first through fourth left fingers.

(Id. at 426.)

### iii.    Carpal Tunnel Syndrome

On December 10, 2009, an EMG revealed Plaintiff suffered from mild bilateral carpal

tunnel syndrome.  (Id. at 314-15.)  The EMG revealed Plaintiff's carpal tunnel was worse on the

right side.  (Id.)  Doctor Carabelli's treatment notes spanning from May 15, 2008, through

February 4, 2010, also list bilateral carpal tunnel syndrome as a diagnosis.  (Id. at 269-16.)  On

December 17, 2009, Dr. Carabelli noted that Plaintiff required a small amount of Oxycodone and

Hydrocodone to control her pain.  (Id. at 270.)

### iv.    Migraines

On May 10, 2007, and July 2, 2007, Plaintiff presented before Diana Hewlett, N.P., and

Elizabeth Eble, APN-C, respectively, with migraine headaches.  (Id. at 246-47.)  On July 2,

2007, Plaintiff was given samples of Maxalt for her migraines.  (Id. at 247.)  On November 16,

2007, and December 14, 2007, Plaintiff saw Ms. Kendra Davis, APN-C, for headache pain.  (Id.

at 253-54.)  Plaintiff presented with migraine headaches again on July 30, 2007.  (Id. at 248.)

Plaintiff was told that if she was taking more than four Maxalt per month, she needed

preventative medicine.  (Id.)  Plaintiff was not open to preventative medicine for her migraines.

(Id.)  On August 24, 2007, Plaintiff was given two tablets of Maxalt and four sample tablets of

2.5 mg Frova for her migraines.  (Id. at 249.)  On September 21, 2007, Plaintiff stated that her

migraine headaches were not as bad, but she was given Maxalt tablets and Frova samples.  (Id. at

250.)  Plaintiff presented with headache pain on October 15, 2007, November 16, 2007, and December 14, 2007, but no further medication was prescribed.  (Id. at 252-54.)

On January 29, 2008, Plaintiff reported to Dr. Alan Carr that she experienced headaches in the back of her head.  (Id. at 510.)  She further stated the headaches worsened when her neck pain increased.  (Id.)  On July 23, 2008, Plaintiff presented to Ms. Jones with migraine headaches.  (Id. at 228.)  Ms. Jones gave Plaintiff two tablets of Zomig.  (Id.)  On December 17, 2008, Plaintiff's migraine headaches were labeled as "stable."  (Id. at 231.)  From January 19, 2009, through March 16, 2009, Plaintiff's migraine headaches were listed as "stable."  (Id. at 198-219.)

### v.      Depression and Bipolar Disorder

On April 1, 2008, Dr. Robert Pasahow evaluated Plaintiff through a psychological examination.  (Id. at 547-66.)  On May 1, 2008, Dr. Henry Sardar observed Plaintiff had a flat, affect, depressed mood, and mild anxiety.  (Id. at 244.)  She was prescribed Prozac and Wellbutrin.  (Id.)  On July 1, 2008, Dr. Pasahow noted that Plaintiff's symptoms included flashbacks and insomnia even when Plaintiff took sedating medication at night.  (Id. at 545.)  Dr. Pasahow also noted that Plaintiff was experiencing clinical depression characterized by dysphoric mood, sense of hopelessness, pervasive sense of failure, loss of ability to enjoy pleasurable events, frequent crying spells, frequent agitation, severe social withdrawal, irritability, severe lack of energy, and suicidal ideation.  (Id.)  Plaintiff experienced general anxiety.  (Id. at 546.)  Finally, Dr. Pasahow found that Plaintiff suffered neuropsychological symptoms including, headaches, decreased reading comprehension, short-term memory deficits, difficulties with verbal comprehension, dysarthria, dysnomia, periodic difficulty verbalizing thoughts, decreased capacity to organize and sequence information, decreased concentration, and

attention difficulties.  (Id.)  As a result, Dr. Pasahow diagnosed Plaintiff with major depressive

disorder and post-traumatic stress disorder, and ruled outpost concussion syndrome.  (Id. at 546,

567.)  At the time, Plaintiff was taking Clonodine for anxiety and Prozac and Wellbutrin for

depression.  (Id. at 546.)

On July 23, 2008, Ms. Jones noted that Plaintiff's mood and affect were within normal

limits.  (Id. at 228.)  Throughout 2009 and up to February 1, 2010, Plaintiff's mood and affect

were appropriate when she presented to Pain Specialists, P.A..  (Id. at 198-219.)

On May 25, 2010, Plaintiff underwent a consultative exam with Dr. P. Lawrence Seifer.

(Id. at 319-22.)  Plaintiff reported experienced two anxiety attacks per day since 1998.  (Id. at

319.)  Plaintiff claimed to be depressed since that time and wanted to sleep because she had low

energy.  (Id.)  Further, Plaintiff had racing thoughts and could not finish projects that she started.

(Id.)  Dr. Carabelli had prescribed Klonopin and Cymbalta.  (Id.)  Dr. Seifer diagnosed Plaintiff

with panic disorder without agoraphobia, bipolar disorder, and depression.  (Id. at 321.)  He

assigned Plaintiff a Global Assessment Functioning ("GAF") score of 55.[1]  (Id.)

### 2.    Hearing Testimony

On February 22, 2012, Plaintiff testified before the ALJ at the Administrative Hearing.

(Id. at 41-70.)  Plaintiff testified that she was involved in a motor vehicle accident in 2007.  (Id.

at 58.)  After the accident, Plaintiff's treatment consisted of physical therapy, chiropractic care,

pain medication, and epidurals in her neck and back.  (Id.)  When this conservative treatment

failed in regards to Plaintiff's neck, Plaintiff testified she underwent surgery in 2008.  (Id. at 59.)

After this surgery, Plaintiff's neck "felt better."  (Id.)  However, she testified that after she went

---

[1] The Global Assessment Functioning or "GAF" scale is a hypothetical range of mental health-illness found in the
Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. (DSM-IV), American Psychiatric Assoc., 1994.  A
GAF score of 51-60 reflects moderate mental symptomology. AMERICAN PSYCHIATRIC ASSOCIATION, Diagnostic
and Statistical Manual of Mental Disorders—Fourth Edition, 34 (1994).

back to work, pain radiated down her neck and arms and her hands started going numb again. (Id.)  Plaintiff testified that the numbness had been there since the accident and had gotten worse over time.  (Id. at 60.)  The pain and the numbness came on when she was doing housework, lifting or folding her arms, and sleeping.  (Id.)  Plaintiff would wake up and not be able to feel her fingers.  (Id.)  The pain and numbness were also worse when it was cold.  (Id.)  Plaintiff testified that the numbness in her fingers was worse on the left side and impacts her ability to hold and grasp things and to do household chores.  (Id. at 61.)  Plaintiff said she could not pick up a gallon of milk with her hand; rather she had to cradle it.  (Id. at 66.)

Further, Plaintiff testified that her lower back pain gives her trouble standing, sitting, and walking for long periods of time.  She stated that she could stand for fifteen-to-twenty minutes, walk ten-to-fifteen minutes, and that she could only drive for twenty minutes before having to stop to stretch.  (Id. at 46-47, 64-65.)  When Plaintiff stood for too long, she got pain on her left side, her legs tingled, her toes went numb, and she felt wobbly.  (Id. at 47.)  Plaintiff also testified that on several occasions she fell, resulting in stiches and further injury.  (Id. at 48.)  For Plaintiff's back and neck pain, she took Vicodin daily and Percocet for "breaktkthrough pain." (Id. at 63.)  She also took Flexeril for muscle spasms in her left leg.  (Id.)

In regards to her migraines, Plaintiff testified that she had one to two migraines a week. (Id. at 62.)  Her migraines would last normally ten hours if she took the appropriate medication, but could last one or two days.  (Id.)  When Plaintiff had a migraine, her arms would tingle and go numb.  (Id.)  Plaintiff testified she took Fioricet for her migraine pain.  (Id. at 63.)

Finally, Plaintiff testified about her psychiatric impairments.  (Id. at 66-69.)  After the accident, Plaintiff treated with Dr. Pasahow.  (Id. at 66.)  Plaintiff stopped that treatment when her insurance "maxed out."  (Id.)  Plaintiff testified that she suffered from anxiety and

depression.  (Id. at 63.)  Plaintiff took Prozac to treat her depression and Clonazepam for anxiety, both prescribed by Dr. Carabelli.  (Id.)  Plaintiff had difficulty focusing and concentrating.  (Id. at 72.)  Plaintiff struggled with her short-term memory.  (Id. at 69.)  Plaintiff testified that she is short tempered, "flies off the handle," and is socially withdrawn.  (Id. at 68-69.)  Even though Plaintiff's medication makes her tired, Plaintiff testified she only gets four hours of sleep on a "good night."  (Id.)  On certain nights, she got no sleep because her mind was "racing."  (Id.)

### C.  Plaintiff's Work History

Plaintiff testified that she graduated from high school and attended several years of college.  (Id. at 48.)  She does not have a degree, but was studying physical therapy and psychology.  (Id.)  During 2005 and 2006, Plaintiff worked as a life skills specialist.  (Id. at 51.) Plaintiff worked with clients who were mentally handicapped or mentally ill.  (Id.)  She began this job by working as a residential counselor in a residential home and would help clients with cooking, hygiene, and medication.  (Id.)  Eventually, Plaintiff began working full-time in the field, going to clients' homes and helping them with doctors' appointments, finding jobs, taking medication, and guiding them on hygiene, cooking, and shopping.  (Id. at 52.)  Plaintiff testified that she started having back problems and leg problems that interfered with her job performance. (Id. at 54.)  Plaintiff could not drive long distances or stand for an extended period of time. (Id.) Plaintiff testified that her doctor told her it was all in her head and to read a book.  (Id.)  After suffering a "breakdown," Plaintiff took vacation time before stopping her job as a life skills specialist.  (Id. at 53.)

After Plaintiff left her job as a life skills specialist, she worked a few days at the "Irish Pub."  (Id. at 57.)  At the end of 2006, Plaintiff testified that she worked part-time at a gift shop for a few months.  (Id. at 56-57.)  In this position, Plaintiff was stocking shelves, helping on the

floor, and cleaning the store.  (Id. at 57.)  Plaintiff had difficulty performing these jobs and left

her job because she could not handle the lifting requirements due to her back.  (Id. at 58.)  A

week later, Plaintiff began working as a [single sales copy representative] at Atlantic City Press

and continued this work full-time until her car accident in 2007.  (Id. at 50, 57.)

     Since Plaintiff's car accident in 2007, Plaintiff testified that she held several part-time

jobs.  (Id. at 45-46, 49-58.)  Plaintiff stated that after the accident she returned to Atlantic City

Press and worked part-time 21-22 hours per week.  (Id. at 50.)  Plaintiff would drive to local

stores and obtain their paper returns and give the store credit for the papers it did not sell.  (Id.)

Plaintiff described her duties as a lot of driving and walking.  (Id.)  Plaintiff was "let go" from

Atlantic City Press because she could not keep up with her route, she was making mistakes, and

she was being very forgetful.  (Id. at 50-51.)

     After being terminated from Atlantic City Press in 2009, Plaintiff worked for

approximately two months as a scanner tech at Super Foodtown.  (Id. at 49.)  In this position,

Plaintiff was responsible for walking through the aisles of the store, scanning the prices of items,

and replacing old sale labels with new sale labels.  (Id.)  Plaintiff described this job as including

a lot of bending and a lot of reaching.  (Id.)  She testified that in September of 2009 she was

terminated her for being too slow.  (Id.)

     Plaintiff testified that since 2011, she has been working 15-20 hours per week watching

two children, ages seven and nine.  (Id. at 45-46.)  Depending on the week, she watches the

children for a few hours a day Monday through Friday or Tuesday through Friday.  (Id.)  In this

position, her main duties are to ensure the children's before they go to school in the morning and

for a few hours after school.  (Id.)  Additionally, she makes little snacks for the children.  (Id.)

## II.   LEGAL STANDARDS

### A.  Standard of Review

In reviewing the Commissioner's final decision, the Court is limited to determining whether the decision was supported by substantial evidence, after reviewing the administrative record as a whole.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 422 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360)).

Nevertheless, the reviewing court must be wary of treating "the existence [or nonexistence] of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983). The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict.  Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) (citing Gober v. Matthews, 574 F.2d 772, 776 (3d. Cir. 1978)).  Furthermore, evidence is not substantial if "it constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).  As such, District Court review of the final determination is a "qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham." Kent, 710 F.2d at 114.

### B.  The Five Step Disability Inquiry

The Commissioner conducts a five-step inquiry to determine whether a claimant is disabled, and therefore, eligible for SSI benefits.  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004); 20 C.F.R. § 404.1520(a)(4) (2012).  The Commissioner must first determine whether the claimant is currently engaged in a "substantial gainful activity" ("SGA").  § 404.1520(a)(4).  If the claimant is currently engaged in SGA, he is ineligible for SSI benefits; if not, the Commissioner moves on to step two, where she determines whether the claimant is suffering from any severe impairment.  Id.  Under the SSA, an impairment is "severe" when it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  § 404.1520(c).

If the Commissioner finds that the claimant's condition is severe, she evaluates whether it meets or equals a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  § 404.1520(d).  If the claimant's physical or mental conditions meet the criteria for any impairment listed in the SSA, they are presumed disabled and entitled to benefits.  Id.  If not, the Commissioner evaluates the claimant's residual functional capacity ("RFC") and determines whether he can return to "past relevant work."  § 404.1520(e).  If the claimant is capable of returning to past relevant work, they are ineligible for SSI benefits.  § 404.1520(f).  If the ALJ finds the claimant is unable to resume past relevant work, or if there is no past relevant work, the burden then shifts to the ALJ to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy."  Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)); see, e.g., Markle v. Barnhart, 324 F.3d 182, 185 (3d. Cir. 2003) (providing example where an ALJ assumed the evidentiary burden at step five despite claimant's lack of relevant work history).

## III.   DISCUSSION

### A.  The ALJ's Decision

14

The ALJ determined that Plaintiff met the insured status requirements of the Act through September 30, 2013.[2]  (Tr. at 18, 20.)  Addressing step one of the sequential analysis, the ALJ determined that Plaintiff did not engage in substantial gainful activity since her alleged onset date of September 19, 2009.  (Id. at 20.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: degenerative disc disease, radiculopathy, carpal tunnel syndrome, and migraine headaches.  (Id.)  The ALJ determined that all other impairments alleged and found in the record were non-severe but determined that these impairments were non-severe because they did not exist for a period of twelve months, were responsive to medication, did not require any significant medical treatment, or did not result in any continuous exertional or nonexertional functional limitations.  (Id. at 21.)  Specifically, the ALJ found Plaintiff's depression and bipolar disorder to be non-severe because the record did not support the conclusion that they caused significant vocationally relevant limitations.  (Id.)

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Id. at 24.)  Plaintiff's attorney argued that Plaintiff met Listing 1.04.  (Id.)  In order to satisfy Listing 1.04, Plaintiff needed to show that her back impairment resulted "in the compromise of a nerve root (including the cauda equine) or the spinal cord with A) evidence of nerve root compression; B) spinal arachnoiditis;

---

[2] Plaintiff alleges disability under sections 216(i) and 223(d) of the Act.  (Tr. at 13.)  In order to be eligible for disability insurance benefits under these sections, Plaintiff must be insured under the Social Security program. Insured Status Requirements, THE SOCIAL SECURITY ADMINISTRATION, http://www.ssa.gov/oact/progdata/insured/html.  The Social Security Administration considers the number of quarters of coverage earned to determine if a plaintiff is insured.  (Id.)  In this case, Plaintiff had sufficient coverage to remain insured through September 30, 2013.  (Tr. 18.)  Thus, Plaintiff must have established disability on or before that date in order to be entitled to a period of disability and DIB.  (Id.)

or C) lumbar spinal stenosis, which causes an inability to ambulate effectively, as defined in 1.00(B)(2)(b)." (Id.)

The ALJ determined that the medical record as a whole did not support a finding that the Plaintiff's back impairment met the requirements of 1.04A because the medical record does not show a positive straight-leg raising test at both sitting and supine positions.[3] (Id.) The ALJ also determined that the record failed to support a finding that Plaintiff's back impairment met the requirements of 1.04B because there was no evidence of spinal arachnoiditis by way of operative or pathology report.[4] (Id.) Finally, the ALJ determined that the record failed to support a finding that Plaintiff's back impairment met 1.04C because Plaintiff does not require two canes, two crutches, or a walker to ambulate, and therefore does has not established that she has the inability to ambulate effectively.[5] (Id. at 24-25.)

Finally, the ALJ considered listing sections 11.00 et seq. pertaining to neurological disorders, but determined the precise criteria were not met. (Id. at 25.)

Before moving to step four, the ALJ determined Plaintiff's RFC. (Id.) The ALJ found that,

> [Plaintiff had] the residual functional capacity to perform unskilled, light work as defined in 20 CFR 404.1567(b) except that she could occasionally climb a ramp or stairs, stoop, crouch, crawl, kneel and balance but never climb a ladder, rope or scaffold, and must avoid concentrated exposure to temperature extremes,

---

[3] 1.04A requires that Plaintiff establish evidence of nerve root compression characterized by "neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflect loss, and if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." (Tr. at 24.)

[4] 1.04B requires that Plaintiff "provide confirmation of spinal arachnoiditis by operative report or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours." (Tr. at 24.)

[5] 1.04C requires that Plaintiff "establish lumbar spinal stenosis by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively. Ineffective ambulation includes the inability to walk without the use of a walker, two crutches or two canes...." (Tr. at 24.)

humidity, wetness, and hazards.

(Id.)

In reaching this conclusion, the ALJ "considered all symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p." (Id.)  The ALJ also "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p." (Id.)

At step four, the ALJ sought to determine whether Plaintiff had the RFC to perform the requirements of her past relevant work by considering (1) whether there were underlying "medically determinable physical or mental impairments"[6] that could be expected to produce Plaintiff's pain and other symptoms; and (2) by evaluating the intensity, persistence, and limiting effects of the Plaintiff's symptoms to determine the extent to which they limited her functioning. (Id.)  The ALJ determined that Plaintiff did have medically determinable physical or mental impairments that could be expected to produce her pain and other symptoms.  (Id. at 26.) However, the ALJ also found "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Id.)  Thus, at step four, the ALJ determined Plaintiff had the RFC to perform her past relevant work as a cashier from September 19, 2009, through the date of the ALJ's opinion and denied Plaintiff's request for DIB.  (Id. at 36.)

In setting Plaintiff's RFC, the ALJ considered each of Plaintiff's severe impairments separately.  (Id. at 32-36.)  First, despite Plaintiff's contrary testimony, the ALJ determined that

---

[6] In accordance with 20 C.F.R. § 404.1508, the ALJ defined "medically determinable physical or mental impairments" as "impairments that can be shown by medically acceptable clinical and laboratory diagnostic techniques."  (Tr. at 25.)

Plaintiff's lumbar degenerative disc disease and radiculopathy did not cause disabling levels of impairment.  (Id. at 32.)  The ALJ found that the level of limitation alleged by Plaintiff was not supported by a preponderance of evidence in the record because "throughout 2009, the medical records refer to her doing well and being involved in several employment situations."  (Id.) Further, her emergency room records from 2010 fail to document great functional limitations. (Id.)  Thus, the ALJ assigned a "light exertional level with additional postural and environmental limitations" for Plaintiff's lumbar degenerative disc disease and radiculopathy.  (Id. at 33.)  More restrictive limitations were not assigned based on the consideration of a number of factors.[7]

In regards to Plaintiff's cervical degenerative disc disease and radiculopathy, the ALJ similarly determined that the level of limitation alleged by Plaintiff was not supported to a preponderance of the evidence in the record.  (Id. at 33.)  The ALJ relied on the same evidence for the cervical degenerative disc disease and radiculopathy as the lumbar degenerative disc disease and radiculopathy.  (Id.)  Additionally, the ALJ noted that Plaintiff testified that after her 2008 surgery she felt better on her right side.  (Id.)  Thus, the ALJ assigned a "light exertional level with additional postural and environmental limitations" for Plaintiff's lumbar degenerative disc disease and radiculopathy.  (Id. at 34.)  More restrictive limitations were not assigned based

---

[7] The ALJ noted several specific factors in not assigning a more limited RFC for Plaintiff's lumbar degenerative disc disorder.  (Tr. at 32.)  First, "[Plaintiff] had started working before the alleged onset date but was laid off on or about October 9, 2009 for an unknown reason. At that time, she was encouraged by Ms. Jones to maintain her activity level by working. Ms. Jones suggested that she not apply for disability."  (Id.) (internal citations omitted).  Secondly, "she needed a small amount of pain medications to control her pain in December 2009..."  (Id.) (internal citations omitted).  Thirdly, "Iselin NJ CDI Unit Investigators … visited [Plaintiff] at her residence on May 21, 2010 and discovered that her functional ability, was not consistent with her testimony or the symptom she presented during her examinations."  (Id.) (internal citations omitted).  Next, "the hospitalist's conclusion on September 6, 2010 that [Plaintiff's] complaints were out of proportion to the objective findings …."  (Id.) (internal citations omitted).  Fifth, Plaintiff's "most recent MRI, performed in December 2007, reveal[ed] only minimal or mild findings without a suggestion of central canal impingement."  (Id.) (internal citations omitted).  Sixth, Plaintiff agreed to wean down her medications on January 24, 2011 and was advised to engage in physical activities such as swimming, walking, or an exercise program."  (Id.) (internal citations omitted).  Finally, the claimant's current part time work taking care of her neighbor's children.  (Id.) (internal citations omitted).

18

on the consideration of a number of factors.[8]  (Id.)

As for Plaintiff's carpal tunnel syndrome, the ALJ determined that Plaintiff did not meet her burden to show her carpal tunnel prevented her from engaging in "frequent reaching, handling, or fingering or lifting up to a light exertional level."  (Id. at 34.)  The ALJ based this decision on the fact that Plaintiff did not undergo traditional treatments for carpal tunnel syndrome, she was not advised to splint her wrists, and she was not advised to undergo surgery to relieve her pain. (Id.)  Further, an EMG from December 2009 revealed only mild carpal tunnel syndrome and Dr. Carabelli determined a small amount of pain medication was enough to control her pain.  (Id.)

Finally, the ALJ considered Plaintiff's migraines.  (Id.)  Despite Plaintiff's testimony that she had three to four headaches a week and one to two migraines per week that can last up to two days in duration, the ALJ assigned "unskilled work at a light level of exertion with additional postural and environmental limitations."  (Id. at 34-35.)  The ALJ's decision was largely based on Plaintiff's lack of treatment records after the alleged onset date, her refusal to take preventative medication in 2007, and the lack of evidence to show that she would be refractory to preventative medication if she chose to take it presently.  (Id. at 34.)

When assessing Plaintiff's credibility, the ALJ took into account Plaintiff's failure to seek treatment for her migraine headaches on a consistent basis and determined that it reduced her credibility.  (Id. at 35.)  The ALJ also considered Plaintiff's work history in assessing her credibility.  (Id.)  The ALJ found that the Plaintiff's current part-time work taking care of two children for 15-20 hours a week does not add to the persuasiveness of Plaintiff's subjective complaints and alleged limitations.  (Id.)

Finally, the ALJ assessed the opinion evidence of Plaintiff's physicians and determined

---

[8] See supra note 7 for some of the factors the ALJ found persuasive.

that these opinions did not support a more limited RFC.  (Id.)  First, the ALJ assigned little weight to Dr. Carabelli's opinion that Plaintiff was disabled because: (1) the medical record conflicted with Dr. Carabelli's conclusions that Plaintiff was disabled; and (2) Dr. Carabelli did not provide a rationale for his conclusion that Plaintiff was disabled.  (Id.)  Rather, Dr. Carabelli relied on Plaintiff's subjective statements.  (Id.)  Further, the ALJ noted that opinions regarding a claimant's ability to work are ultimately reserved to the Commissioner.  (Id.)

The ALJ also assigned little weight to the opinion of Dr. Glass.  (Id.)  Dr. Glass examined Plaintiff on November 7, 2009, following an MRI that had been done a few days prior.  (Id.)  Dr. Glass saw Plaintiff again in February of 2010.  (Id.)  No additional imaging was performed between the November and February appointments to support Dr. Glass's opinion that Plaintiff was not capable of working.  (Id.)  The ALJ determined that Plaintiff's moderate limitation in her range of motion with tenderness and spasm alone did not support Dr. Glass's opinion.  (Id.)  Rather, the medical record suggested that Dr. Glass's opinion was based heavily on Plaintiff's statements that she could not work due to her pain.  (Id. at 36.)  Even if it had supported Dr. Glass's opinion, opinions regarding Plaintiff's ability to work are reserved to the Commissioner. (Id. at 36.)

The ALJ determined that Plaintiff had past relevant work as a gift shop cashier, which is described as unskilled and light in the Dictionary of Occupational Titles ("DOT").  (Id. at 36.) The ALJ found that Plaintiff could perform this job as it was generally performed because the requirements for the job of cashier did not require Plaintiff to be "exposed to environmental conditions aside from moderate limitations in noise level."  (Id.)  Further, the requirements of gift shop cashier "involve[d] no postural demands but [did] require frequent reaching, handling, fingering, talking, hearing, and near acuity."  (Id.)  Since the ALJ found that Plaintiff did not

have any of these limitations in her assigned RFC, the ALJ determined she was able to perform
her past relevant work.  (Id.)

Despite the ALJ's finding at step four that Plaintiff was able to return to her past relevant
work as a cashier, the ALJ nevertheless made "alternative findings" under step five and
determined that there were other jobs existing in the national economy that Plaintiff was able to
perform.  (Id.)  In making this determination, the ALJ considered Plaintiff's RFC, age, education,
and work experience in connection with the Medical-Vocational Guidelines.  (Id.)  Plaintiff was
45 ("a younger individual") at her alleged onset date, has at least a high school education, and
has the ability to communicate in English.  (Id.)  The ALJ determined that the transferability of
job skills was not material to the determination of disability because the Medical-Vocational
Rules framework supported a finding that Plaintiff was not disabled, regardless of whether her
job skills were transferable.  (Id.)  Thus, there were a number of other jobs existing in the
national economy that Plaintiff was able to perform.  (Id. at 36-37.)

Since Plaintiff was capable of performing her past relevant work as a gift shop cashier,
or, alternatively, was capable of performing a number of jobs existing in the national economy,
the ALJ determined that Plaintiff was not under a disability as defined by the Act from
September 19, 2009, through March 22, 2012.  (Id. at 37.)

**B.  Plaintiff's Appeal**

**1.  The ALJ Properly Determined that Plaintiff's Impairments did not Meet
Medical Listing 1.04A Involving Disorders of the Spine at Step 3**

Plaintiff argues that the record reflects findings that satisfy Medical Listing 1.04A and
therefore Plaintiff should have been deemed disabled and awarded benefits at step three.  (Pl.'s
Br. at 6-8.)  As discussed supra in Part II.B of this opinion, at step three of the sequential
analysis, the ALJ must determine whether the medical evidence of the claimant's impairment or

combination of impairments meets or equals the criteria listed in 20 C.F.R. Pt. 404, Subpt. P,

App. 1.  § 404.1520(d).  Medical Listing 1.04A provides:

> 1.04 Disorders of the Spine (e.g. herniated nucleus pulosus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflect loss, and if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Pt. 404, Subpt. P, App. 1.

In order to satisfy Medical Listing 1.04A, Plaintiff's impairment "must meet all of the

specified medical criteria. An impairment that manifests only some of those criteria, no matter

how severely, does not qualify."  Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992)

(quoting Sullivan v. Zebley, 110 U.S. 521, 530 (1990)) (emphasis in original).  The plaintiff

bears the burden of presenting enough evidence to support an allegation of a disability equal to a

medical listing.  Williams, 970 F.2d at 1186.

The ALJ determined that Plaintiff failed her burden to show she met all of the criteria of

Medical Listing 1.04A.  (Tr. at 24.)  Specifically, Plaintiff failed to provide evidence of a

"positive straight leg test at both sitting and supine positions."  (Id.)  While the record does

indicate a positive straight leg raising test on October 1, 2009, December 17, 2009, February 4,

2010, September 20, 2010, and January 24, 2011, the medical record does not disclose what

position the straight-leg testing was done in.[9]  (Id. at 270, 272, 274, 276, 426.)  Therefore, the

---

[9] Although the record also indicates multiple positive straight leg raising tests, these tests are from before the alleged onset date.  (See Tr. 278, 279, 281, 284, 287, 290, 292, 295, 297, 300, 303, 306, 309, 312, 429, 611, 615.)  Even if

required positive straight leg raising test, both sitting and supine, are missing from the administrative record. See Garrett v. Comm'r of Soc. Sec., 274 Fed. App'x 159, 163 (3d Cir. 2008) (affirming ALJ's decision that Plaintiff's impairment did not meet 1.04A because Plaintiff failed to show she met all of the criteria). This medical testing is crucial in making disability determinations. See 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B) ("The physical examination must include a detailed description of the rheumatological, orthopedic, neurological, and other findings appropriate to the specific impairment being evaluated."); see also Boggs v. Colvin, No. 13-1229, 2014 WL 1670892, at *20 (W.D. Pa. April 28, 2014) (holding Plaintiff failed to prove he met all of the criteria for listing 1.04A because his straight-leg test was only done in the supine position); Wilcox v. Astrue, No. 11-853, 2012 WL 3238753, at *2-3 (N.D. Ohio Aug. 7, 2012) (holding Plaintiff failed to prove his impairments met 1.04A because the medical record did not clearly state whether the positive straight leg raising test was done in both sitting and supine positions).

Further, there was also evidence of negative straight leg raising tests after Plaintiff's alleged onset date. (Tr. at 199, 201, 213, 215, 217.) Accordingly, the ALJ's decision that the Plaintiff failed to establish her impairments met all of the requirements of the listing severity of 1.04A was based on substantial evidence, and the ALJ did not commit error at Step Three.

### 2.  The ALJ did not Err at Step 4

#### i.  The ALJ Properly Determined the Weight Given to the Treating Source Opinions of Dr. Carabelli and Dr. Glass

Plaintiff alleges the ALJ erred at Step 4 by assigning "little weight" to the treating source opinions of Dr. Carabelli and Dr. Glass when assessing Plaintiff's RFC. (Pl.'s Br. at 8.) Plaintiff

---

these tests were to be taken into account, they do not solve Plaintiff's primary issue, as these tests also fail to indicate whether the testing was done in the sitting position, supine position, or both.

argues that as the treating physicians of record, Dr. Carabelli's and Dr. Glass's opinions were both entitled "controlling weight" because "both are supported by the diagnostic evidence of record and are not inconsistent with each other or other substantial evidence in the case record." (Pl.'s Br. at 11.) Alternatively, Plaintiff argues Dr. Carabelli's and Dr. Glass's opinions were at the very least entitled to "great weight" because "they are the treating source physicians of record and have treated Plaintiff over a long period of time, providing the benefit of a longitudinal perspective of Plaintiff's treatment and the nature and extent of her limitations." (Id.)

### a.  Treating Source Opinions on Issues Reserved to the Commissioner are Never Entitled Controlling Weight

Generally, the Commissioner will give a treating physician's opinion on the nature and severity of a claimant's impairments controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).[10]  There are certain medical source opinions on issues reserved to the Commissioner, however, that will not be entitled to controlling weight because they are administrative findings that are dispositive of the case. § 404.1527(d).  Therefore, a treating physician's opinion that a claimant is "disabled" or "unable to work" is not a "medical opinion" and is not entitled controlling weight because whether the claimant is "disabled" within the meaning of the Act is an administrative opinion reserved for the Commissioner.  See § 404.1527(d)(1) ("[The Commissioner] is responsible for making the determination or decision about whether [a claimant] meets the statutory definition of

---

[10] Effective March 26, 2012, the Commissioner amended § 404.1527 to remove subsection (c) and redesignate former paragraphs (d) through (f) as (c) through (e).  See How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651, 10,656 (Feb. 23, 2012) (codified at 20 C.F.R. § 404.1527 and 416.927).  As the pertinent subject matter has not changed, in this opinion, the Court applies and references the version of § 404.1527 in effect as of the date of this opinion.

disability. … A statement by a medical source that [a claimant is] "disabled" or "unable to work" does not mean that [the Commissioner] will determine that [a claimant is] disabled."); § 404.1527(d)(3) ("[The Commissioner] will not give any special significance to the source of an opinion on issues reserved to the Commission described in paragraph (d)(1)…."); SSR 96-5p, Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner, 61 FR 34471 (1996) (also available at http://www.socialsecurity.gov/OP_Home/rulings/di/01/SSR96-05-di-01.html) ("[E]ven when offered by a treating source, [opinions about whether an individual is "disabled"] can never be entitled to controlling weight or given special significance.") (emphasis added).

In this case, the ALJ properly determined that the Dr. Carabelli's opinion that Plaintiff was totally and permanently disabled and Dr. Glass's opinion that claimant was not capable of working were not entitled controlling weight because these are opinions reserved to the Commissioner.  (Tr. at 35-36.)

### b. Treating Source Opinions on Issues Reserved to the Commissioner cannot be Disregarded Entirely

Alternatively, Plaintiff argues that Dr. Carabelli's and Dr. Glass's opinions were entitled to "great weight" because "they are the treating source physicians of record and have treated Plaintiff over a long period of time, providing the benefit of a longitudinal perspective of Plaintiff's treatment and the nature and extent of her limitations."  (Pl.'s Br. at 11.)

While physician opinions on issues reserved to the Commissioner are never entitled controlling weight, these opinions should not be disregarded by the ALJ.  § 404.1527(c); see SSR 96-5p (Medical source opinions on issues that are reserved to the Commissioner "must not be disregarded.")  A treating physician's opinion is generally given more weight than a non-treating physician's opinion because "these sources are likely to be the medical professionals

most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective of the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."  § 404.1527(c)(2).  How much weight a treating source's opinion receives when it is deemed not to be controlling depends on the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the support provided by the medical record and the explanation given by the treating physician for his opinion, and the consistency of the opinion with the record of a whole.  § 404.1527(c)(2); id. (c)(2)(i); id. (c)(2)(ii); id. (c)(3); id. (c)(4); id. (c)(5).

The Third Circuit has held that treating physicians opinions should typically be given great weight "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.  Rocco v. Heckler, 826 F.2d 1348, 1350 (3d. Cir. 1987).  However, an ALJ "may afford a physician's opinion more or less weight depending upon the extent to which supporting explanations are provided." Plummer, 186 F.3d at 429 (citing Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985)); see also Cunningham v. Comm'r of Soc. Sec., 507 Fed. App'x 111, 118 (3d Cir. 2012) ("[A] treating physician's opinion … may be accorded less weight depending upon the extent to which a supporting explanation is provided for the opinion.")

The ALJ determined that Dr. Carabelli's and Dr. Glass's opinions were entitled to only "little weight," rather than great weight.  (Tr. at 35.)  At the outset, the Court notes that the ALJ did not choose to disregard the opinions of Dr. Carabelli or Dr. Glass entirely, meaning he was not required to support his decision based on contradictory medical evidence.  Cf. Cunningham, 507 Fed. App'x at 118 ("[A] treating physician's opinion may be rejected on the basis of

contradictory medical evidence, or may be accorded less weight depending upon the extent to which a supporting explanation is provided for the opinion.") (emphasis added); Plummer, 186 F.3d at 429 ("When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'") (citing Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)) (emphasis added).  Where the ALJ is discounting, rather than rejecting the weight of the opinion evidence, he must "consider all the evidence and give some reason for discounting the evidence."  Plummer, 186 F.3d at 429 (citing Stewart v. Secretary of H.E.W., 714 F.2d 287, 290 (3d Cir. 1983)) (emphasis added); see also Johnson v. Comm'r of Soc. Sec. 529 F.3d 198, 204 (3d Cir. 2008) (holding that "an ALJ may not reject pertinent or probative evidence without explanation," but also noting that there was "no authority for the proposition that an ALJ must cite all evidence a claimant presents, including evidence that is irrelevant to her case.")  Based on the evidence in the record and the ALJ's asserted reasons, the Court finds that the ALJ's determination of how much weight to give the treating physicians' opinions was consistent with the regulations and supported by substantial evidence.

With respect to Dr. Carabelli's opinions, the ALJ concluded that the actual treatment records from Dr. Carabelli were in conflict with his conclusion that Plaintiff was totally disabled. (Tr. at 35.)  The ALJ noted that the doctor failed to provide a rationale for this conclusion, which was significant in light of the conflict between many of his treatment notes and his conclusion regarding Plaintiff's disability.  (Id.)  Further, the ALJ found that, based on the medical record in this case, Dr. Carabelli must have relied heavily on Plaintiff's own subjective statements to guide his opinion.  (Id.)  As for Dr. Glass, the ALJ found his February 2010 opinion did not contain notes or objective evidence supporting his determination of Plaintiff's ability to work.  (Id. at 35-36.)  Without a more recent imaging study to support his conclusion, the ALJ concluded that Dr.

27

Glass's February 2010 opinion was not supported by the diagnostic record, was in conflict with the medical record, and thus was likely based on Plaintiff's own subjective statements.  (Id.) According to the ALJ's decision, he determined that the relevant opinions from Dr. Carabelli and Dr. Glass during the critical period were not supported by the medical signs or laboratory findings reported in their examinations, and were not consistent with the medical record.  (Id.; see § 404.1527(c)(3)-(4).)  The ALJ's findings and the record support this conclusion.

As noted by the ALJ, Dr. Carabelli's examination comments referred in part to certain negative symptoms reported by Plaintiff, such as tenderness, restricted cervical and lumbar range of motion, positive straight leg raising, and an unspecified decrease of sensation in the lower left extremity and left fingers.  (Tr. at 270, 272, 274, 426, 429; see also id. at 27-28, 30.)  Yet Dr. Carabelli also consistently noted that Plaintiff's extremity range of motion and strength was "functionally within normal limits," that she had only "mild" restriction of the left shoulder range of motion, only one-grade weakness in her upper extremities, and only half-grade weakness in her lower extremity.  (Id. at 270, 272, 274, 426, 429; see also id. at 27-28, 30.) During the critical period, Dr. Carabelli's records also indicate that he recommended an exercise program of swimming and/or walking for Plaintiff, and found that Plaintiff had grip strength of 55 pounds in her right hand and 25 pounds in her left hand.  (Id. at 426, 429; see also id. at 27-28.)  Further, while Plaintiff required "a small amount" of Oxycodone in addition to Hydrocodone for her pain, Dr. Carabelli also recommended that Plaintiff wean down her medications.  (Id. at 272, 429; see also id. at 28-29.)  Because Dr. Carabelli's opinions on the issue of Plaintiff's disability could reasonably be considered inconsistent with, and unsupported by the doctor's own diagnostic results and various examination notes, the Court finds that the

ALJ's reason for discounting the weight of Dr. Carabelli's opinion evidence was based on substantial evidence.

Dr. Glass concluded in one of his opinions during the critical period that Plaintiff was not capable of working.  (Id. at 262.)  However, Dr. Glass saw Plaintiff three times during the critical period, and each time he found that Plaintiff had 5/5 power in neurological testing, and had no sensory deficits.  (Id. at 262-64.)  During that same period, Dr. Glass's examinations revealed that Plaintiff had mild and moderate restriction of her cervical spine range of motion.  (Id.; id. at 29.)  He recommended a home exercise program for Plaintiff in November 2009, and she agreed to continue with that program at her follow-up appointment in February 2010.  (Id. at 262-63.)  The record also indicated that she underwent an MRI in early November 2009, prior to her examination with Dr. Glass that month, but no subsequent MRI prior to her February 2010 visit with him.  (Id.)  It was reasonable for the ALJ to find that these records did not contain adequate objective or laboratory support for Dr. Glass's opinion on the issue of Plaintiff's ability to work, in light of the mild recorded symptoms in his examination notes and diagnostic results, and no significant change in Plaintiff's symptoms from the examination just after her surgery in November 2009 and the next examination in February 2010.  The Court finds the ALJ provided an adequate reason for discounting the weight of Dr. Glass's opinion evidence, due to a lack of support, and the ALJ's decision was based on substantial evidence.  Accordingly, the ALJ satisfied his burden of articulating "some reason" for reaching his decision with respect to each doctor's opinion evidence, specifically the lack of objective or diagnostic evidence to support the their opinions.  Plummer, 185 F.3d at 429; id. ("An ALJ … may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.")

Additionally, the ALJ concluded that, in light of the medical record, each doctor's opinion as to Plaintiff's ability to work or level of disability must have been based primarily on Plaintiff's own subjective statements of her pain.  (See Tr. at 35 ("Instead, the medical record suggests that Dr. Carabelli relied heavily on the claimant's subjective statements to guide his opinion."); id. at 35-36 ("the medical record suggests that Dr. Glass relied heavily on the claimant's statement that she could not work due to the severity of her pain in concluding that she was disabled."); see also id. at 25 ("The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.").)[11]  In other words, not only did the doctors' opinions lack satisfactory explanations for their own internal contradictions, but the doctors' opinions were also inconsistent with the medical record, further eroding their credibility.  Cf. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.")

The medical record in this case, and the ALJ's various findings, support this conclusion of the ALJ.  Examinations with other doctors during the critical period revealed Plaintiff had lumbar and cervical tenderness, but otherwise showed that she was alert, fully oriented, and in not acute distress, with appropriate mood and affect, clear speech, negative straight leg raising, steady gait, full five out of five strength in her upper and lower extremities, "equal and strong" hand grasps, and no neurological deficits.  (Tr. at 199, 201, 213, 215, 217; see also id. at 27, 30.) Plaintiff appeared to be doing "very well" on her medication, with a moderate pain level of 5/10. (Id. at 199, 201, 215, 217; see also id. at 27, 30.)  The notes of Ms. Jones, from October 9, 2009, indicate that Plaintiff mentioned she lost her job for an unknown reason, and Ms. Jones

---

[11] Although the ALJ could have explained this analysis more clearly, the Court agrees that objective record evidence contradicts Dr. Carabelli's and Dr. Glass' opinions.  See Plummer, 186 F.3d at 429.

encouraged Plaintiff to continue working, rather than go on disability.  (Id. at 213-14; see also id. at 32-33.)  Plaintiff also visited the emergency room several times during 2010, and during those visits she apparently demonstrated no sensation deficits, and generally had the ability to move her extremities without decreased range of motion.  (See id. at 375-76, 387-88, 400-01, 409-10; see also id. at 27, 29-30, 32-33.)  The Court considers this further substantial evidence in support of the ALJ's decision to afford Dr. Carabelli's and Dr. Glass's opinions "little weight."

    While not discussed in any detail by the ALJ in his findings on the weight of the treating physicians' opinion testimony, the records from Plaintiff's doctors prior to the onset of the relevant period do not undermine his determination, as Plaintiff alleges.  (Pl.'s Br. at 10.)  It appears from the record that Plaintiff's condition was more severe prior to the start of the relevant period, after her 2007 automobile accident, (see Tr. at 434-48), and by June 2008 Plaintiff's chiropractor, Dr. Rizzo, recommended surgery with Dr. Glass to treat Plaintiff's worsening symptoms.  (Id. at 604, 611, 615; see also id. at 28.)  After Dr. Glass performed spinal fusion surgery in September 2008, Plaintiff reported one hundred percent pain relief in her neck, (id. at 230-31; see also id. at 29), and continued to report one hundred percent relief from her cervical spine symptoms through August 2009.  (Id. at 198, 203-219.)  Nor do the findings of Dr. Rizzo help Plaintiff's case.  (See Pl.'s Br. at 10-11.)  While Dr. Rizzo's opinions may have lent additional support to the opinions of Drs. Carabelli and Glass at the time Plaintiff was still seeing Dr. Rizzo, the fact that his opinions pre-date not only Plaintiff's alleged disability onset date, but also her September 2008 cervical spine surgery mean the ALJ was under no obligation to consider his opinions when making his findings concerning the relevant opinion testimony of Drs. Carabelli and Glass.  See SSR 06-03p ("In addition to evidence from 'acceptable medical sources,' we may use evidence from 'other sources,' … to show the severity of the individual's

impairment(s) and how it affects the individual's ability to function. These sources include, but are not limited to: … chiropractors[.] …  Information from these 'other sources' cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose.")  Because Plaintiff underwent cervical surgery in September 2008, which apparently gave her one hundred percent pain relief at the time, the ALJ could have reasonably chosen to disregard the pre-surgery examinations in evaluating the treating physicians' opinions from the relevant period, and to discount or disregard Dr. Rizzo's pre-surgery opinions when weighing the medical record evidence.  See Johnson, 529 F.3d at 204 (finding "no authority for the proposition that an ALJ must cite all evidence a claimant presents, including evidence that is irrelevant to her case.")

Despite Plaintiff's contention, the ALJ could reasonably find that Dr. Carabelli's and Dr. Glass's opinions were not "well-supported by the diagnostic evidence of record … or other substantial evidence in the case record."  (Pl.'s Br. at 11.)  Where, as here, doctors' examination notes from the critical period appear to conflict with their conclusions regarding the extent of the patient's disability, the doctors provide no further support for their opinions, and their opinions conflict with the medical record more broadly, the ALJ's decision to accord "little weight," rather than great weight to these treating physicians' opinions was proper.  The ALJ provided sufficient detail about the evidence he chose to credit and discredit to allow this Court to provide meaningful judicial review, and the ALJ did not commit error.

### ii.   The ALJ Properly Evaluated Plaintiff's Severe and Non-severe Impairments in Formulating the RFC

Plaintiff argues that the ALJ failed to properly consider her carpal tunnel syndrome, migraine headaches, and mental symptoms when evaluating her severe and non-severe impairments and formulating the RFC pursuant to SSRs 96-8p and 96-3p.  (Pl.'s Br. at 16-20.)

At Step 2 the ALJ determined that Plaintiff had carpal tunnel syndrome and migraine headaches as severe impairments, pursuant to 20 C.F.R. § 404.1520(c).  (Tr. at 20.)  All other impairments reported by Plaintiff were determined to be non-severe, and the ALJ further found that the record did not support Plaintiff's contention that her depression and bipolar disorder caused significant vocational limitations.  (Id. at 21.)  Later in his decision, the ALJ went on to find that Plaintiff had the RFC "to perform unskilled, light work as defined in 20 C.F.R. § 404.1567(b) except she could occasionally climb a ramp or stairs, stoop, crouch, crawl, kneel and balance but never climb a ladder, rope or scaffold, and must avoid concentrated exposure to temperature extremes, humidity, wetness, and hazards."  (Id. at 25.)  As part of Step 4, the ALJ first found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Id. at 26.)[12]

### a.  Carpal Tunnel Syndrome

The ALJ found the Plaintiff's carpal tunnel syndrome to be severe at Step 2.  (Id. at 20.)  At Step 4, the ALJ first noted the EMG and nerve conduction study, performed on December 10, 2009, revealed mild carpal tunnel syndrome, and Plaintiff required a small amount of Oxycodone

---

[12] The ALJ went on to explain that "[Plaintiff's] reports of pain are not consistent with the medical record as a whole.  Social Security Regulation 20 C.F.R. § 404.1529 and [SSR] 96-7p provide, in pertinent part, that when pain is reported in excess of what would be expected by the medical evidence, further evaluation must be made.  The claimant's prior work record, observations of treating physicians and other persons regarding the nature of the claimant's symptoms … [and] the use of medication and other treatment for relief of the symptoms … must be considered.  Subjective complaints may be discounted if there are inconsistencies in the record as a whole. … In this instance, a number of the claimant's impairments could reasonable cause some symptomology.  However, the pivotal question is not whether such symptoms exist, but whether those symptoms occur with such frequency, duration or severity as to reduce the claimant's residual functional capacity or to preclude all work activity on a continuing and regular basis.  In this case, a careful review of the record does not document sufficient objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged by the claimant."  (Tr. at 31.)

and Hydrocodone to control her pain, (id. at 30 (citing id. at 270-72)), as evidence that Plaintiff's carpal tunnel syndrome, a medically determinable impairment, could reasonably be expected to cause the alleged symptoms.  (See id. at 25-56.)  Next, the ALJ addressed Plaintiff's own statements regarding "the intensity, persistence, and limiting effects" of her carpal tunnel symptoms, in light of the objective medical evidence in the case record, to determine the extent to which they limited her functioning.  (See id. at 25.)  Based on this analysis, the ALJ concluded Plaintiff's carpal tunnel syndrome did not prevent her from "engaging in frequent reaching, handling, or fingering or lifting up to a light exertional level."  (Id. at 34; see also id. at 25.)

In reaching his conclusion, the ALJ first discussed Plaintiff's testimony.  Specifically, Plaintiff's testimony that she felt better on her right side after her 2008 surgery, that she began feeling pain radiating to her arms and hands when she went back to work, that she experienced pain and numbness in both hands, and that over the two and a half years since her auto accident, the numbness in her hands has increased, and causes problems with grasping and holding.  (Id.)  Despite Plaintiff's testimony, the ALJ found that the absence of treatment, the absence of objective evidence supporting a conclusion that her carpal tunnel syndrome had progressed beyond the mild state, and the absence of functional limitations specifically linked to her carpal tunnel syndrome in the medical record as a whole indicated that Plaintiff's carpal tunnel syndrome did not prevent her from engaging in the activities described above.  (Id.)  Additionally, the ALJ noted that Plaintiff's December 2009 EMG revealed only mild findings of carpal tunnel syndrome, and shortly thereafter Dr. Carabelli concluded that she only required a small amount of pain medication, indicating Plaintiff's carpal tunnel pain did not affect her to a significant degree.  (Id.)

Plaintiff's argument seems to assume that because the ALJ found Plaintiff's carpal tunnel syndrome to be severe at Step 2, it must necessarily limit her functioning to more than "unskilled, light work as defined in 20 C.F.R. § 404.1567(b)," including "frequent reaching, handling, or fingering or lifting up to a light exertional level." (Tr. at 25, 34; see also Pl.'s Br. at 16-17.) Plaintiff, however, does not cite any case law suggesting that the ALJ failed to account for Plaintiff's carpal tunnel syndrome merely because he found it to be severe at Step 2 and assigned her the RFC to perform light work, including a finding that she could perform hand and grip related activities up to a light exertional level. While Plaintiff did testify she had numbness in her hands and problems with grasping and holding, the ALJ noted that her lack of treatment of carpal tunnel syndrome and the lack of objective evidence that her carpal tunnel syndrome was anything more than mild, or connected to any specific functional limitations, meant she had not met her burden of limiting her functional capacity beyond light work and the specific exertional limitations described. (Tr. at 34; see also SSR 96-8p.)

Plaintiff also wants to second guess the ALJ's consideration of the medical record before him, pointing to two pieces of medical evidence from prior to her 2008 surgery which the ALJ allegedly disregarded. (See Pl.'s Br. at 16-17 (citing Tr. at 510, 611).) However, viewing the evidence on the record, particularly that evidence from after Plaintiff's surgery and during the relevant period, the ALJ's determination that there was an absence of objective evidence that her carpal tunnel syndrome was anything more than mild, or connected to any specific functional limitations, is supported by substantial evidence. As noted by the ALJ, the only EMG study conducted during the relevant period revealed "mild" bilateral carpal tunnel syndrome, and only a small amount of medication for pain management. (Id. at 315; see also id. at 510-11 (noting Plaintiff's 2007 EMG revealed "mild" carpal tunnel syndrome, and finding no "demonstrable

35

[numbness]" and four out five grip strength in each hand at her January 2008 examination).)  Nor did the record indicate that Plaintiff had undergone any traditional treatment for her carpal tunnel syndrome.  (Id. at 34; see also 20 C.F.R. § 404.1529(c)(3)(v); SSR 96-7p ("[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints.").)  Though not discussed by the ALJ in detail beyond reference to "the medical record as a whole," the medical record contained reports of examinations by Ms. Jones during the relevant period that found Plaintiff had "equal and strong" hand grasps.  (Tr. at 199, 201, 215, 217; see also id. at 30.)  The ALJ could have reasonably considered the two items of evidence predating Plaintiff's 2008 surgery to not be conflicting, and failed to address them on that basis, particularly in light of the weight of the strong objective evidence on the record from the relevant period supporting the ALJ's finding.  See Johnson, 529 F.3d at 204.

This case is not analogous to Smith v. Califano, 637 F.2d 698 (3d Cir. 1981), where the ALJ's decision was "just too speculative to be sustainable," because "all evidence as to disabling pain [was] favorable to the plaintiff."  Id. at 971-72.  In that case the Third Circuit found that where "there [was] no factual basis upon which the ALJ could reject claimant's testimony of disabling pain, his subjective complaints [stood] unrebutted."  Id. at 972 (internal quotation marks omitted) (quoting Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975)).  Here, however, the ALJ did take into account Plaintiff's subjective complaints, weighed them against the objective evidence available throughout the medical record, and determined that they did not support a finding of a more serious functional limitation.  (See Tr. at 25-26 (considering the objective evidence and finding the reasonable existence of the alleged symptoms of Plaintiffs medically determinable impairments, but also finding Plaintiff's statements concerning the intensity, persistence, and limiting of effects of those symptoms credible to the extent they are

36

inconsistent with the RFC, based on the ALJ's consideration of the entire record); see also

Taybron v. Harris, 667 F.2d 412, 415 n.6 (3d Cir.1981) (noting that "[t]estimony of subjective

pain is entitled to weight if it is supported by competent medical evidence.") (emphasis added)

(citing Smith, 637 F.2d at 972; Dobrowolsky v. Califano, 608 F.2d 403, 409 (3d Cir. 1979)).)

Accordingly, this Court does not find that the ALJ ignored his obligations under the Third

Circuit's case law, but instead properly determined Plaintiff's carpal tunnel syndrome did not

prevent her from "engaging in frequent reaching, handling, or fingering or lifting up to a light

exertional level," based on substantial evidence.

### b. Migraine Headaches

As noted above, the ALJ found Plaintiff's migraine headaches severe at Step 2.  (Tr. at

20.)  At Step 4, the ALJ cited evidence from the record that Plaintiff reported to Ms. Jones in

2007 that one dose of Maxalt caused her migraine pain to resolve, but Plaintiff indicated that she

opposed further preventative treatment with medicine.  (Id. at 30.)  In January 2008 Plaintiff

reported to Alan Carr, D.O., that she experienced headaches, occurring in the back of the head,

and that when her neck pain increased, her headaches worsened.  (Id.)  Also, in July 2008 Ms.

Jones indicated that Plaintiff occasionally experienced migraine headaches.  (Id.)  After having

determined that Plaintiff had a medically determinable impairment, which could reasonably be

expected to cause the alleged symptoms, (see id. at 25-26), the ALJ went on to conclude that

Plaintiff's subjective statements regarding the severity of her symptoms were not supported by

objective evidence, and were insufficient to support such severity as to preclude the RFC the

ALJ assigned to Plaintiff, which incorporated "additional postural and environmental

limitations," in consideration of her migraine headaches.  (Id. at 34-35; see also id. at 25.)

In support of this conclusion, the ALJ noted Plaintiff's own testimony that she had three to four headaches a weeks and one to two migraine headaches a week, that her migraines continue for a day or two, that her average migraine can be controlled with medication within ten hours, and that her migraines have continued since six months after her surgery.  (Id. at 34.)  However, the ALJ found that Plaintiff's only treatment records involving her migraines occurred prior to the alleged onset date of her disability, and she had previously been informed that she might require treatment with preventative medication for her migraines, yet she had refused such medication in 2007.  (Id.)  Nor did the record reflect that she would be resistant to preventative medication if she chose to take it presently.  (Id.)  In light of the absence of treatment after the alleged onset date of Plaintiff's disability and the lack of consistent treatment throughout the medical record on the whole, despite Plaintiff's complaints about her continuing migraine headaches, the ALJ found Plaintiff's testimony less credible.  (Id. at 34-35.)

Again, Plaintiff's argument seems to be that because the ALJ found Plaintiff's migraine headaches to be severe at Step 2, he must necessarily limit her functioning to more than "unskilled, light work as defined in 20 C.F.R. § 404.1567(b)," with the additional postural and environmental limitations described.  (See Tr. at 25 (noting specific restriction from jobs involving ladders, ropes, or scaffold, as well as jobs involving concentrated exposure to temperature extremes, humidity, wetness, and hazard); id. at 35 (assigning "additional postural and environmental limitations" with the RFC in consideration of Plaintiff's migraine headaches); see also Pl.'s Br. at 17.)  Where, as here, an ALJ properly considers the evidence on the record and Plaintiff's subjective statements, the Court finds no error in the ALJ's decision to only assign certain additional nonexertional limitations on Plaintiff's RFC in light of her migraine headache symptoms, i.e., postural and environmental limitations.  See SSR 96-8p.

Because the ALJ's determination to give Plaintiff's subjective statements regarding the severity of her symptoms less credibility, in light of the lack of objective medical evidence on the record supporting her statements, and the lack of documented treatment for her symptoms, was based on substantial evidence, he did not err.  (Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000) ("Although allegations of pain and other subjective symptoms must be consistent with objective medical evidence, the ALJ must still explain why he is rejecting the testimony.") (internal citations omitted).

### c.  Mental Symptoms

Plaintiff next alleges that the ALJ either failed to find Plaintiff's mental impairments severe at Step 2, and in turn failed to properly assess the impact of these impairments on Plaintiff's functional limitations at Step 4, or failed to consider the impact of these impairments at Step 4 even if the ALJ properly determined Plaintiff's mental impairments were non-severe. (Pl.'s Br. at 18-19.)  Because the ALJ properly determined at Step 2 that Plaintiff's mental impairments were non-severe, the Court only addresses Plaintiff's second argument.[13]

---

[13] Plaintiff seemingly presents an argument that the ALJ improperly determined Plaintiff's mental impairments were non-severe at Step 2, couched within her broader RFC claim.  As an initial matter, the Court finds that the ALJ properly found Plaintiff's mental impairments to be non-severe at Step 2.

The ALJ's decision indicates that he fully considered the evidence in the record, and concluded that Plaintiff's mental impairments were not severe during the relevant period.  (See Tr. at 21-24.)  This included discussion of evidence of Plaintiff's depressive, anxiety, and bipolar disorders and diagnoses dating back to April 2008, as well as objective medical evidence from examination notes through the relevant period.  (Id.)  While the ALJ noted evidence on the record from Plaintiff's 2010 examination by Dr. Seifer suggesting that Plaintiff had moderate limitations due to a combination of physical and mental impairments, (id. at 21-22 (citing id. at 319-22)), he ultimately found Dr. Charles' 2010 conclusion that Plaintiff's limitations did not impede her mental abilities for substantial gainful activity more persuasive.  (Id. at 22 (citing id. at 348-51).)  In so finding, the ALJ weighed other mental health evidence on the record, some of Dr. Seifer's own comments and observations from his report regarding Plaintiff's capabilities, and the lack of any further examination or treatment for Plaintiff's mental impairments during the relevant period.  (Id. at 22.)  Dr. Charles's and Dr. Burstein's opinions were afforded "great weight" by the ALJ, as he found them to be consistent with the medical record as a whole.  (Id. at 24; see also § 404.1527(f)(2); SSR 96-6p.)  The ALJ also found a lack of evidentiary support for Plaintiff's own statements that she had difficulty interacting with people, as part of finding that Plaintiff had not established, in light of the medical record as a whole, that her mental impairments are severe by a preponderance of the evidence.  (Id. at 22.)  Thus, the ALJ concluded that Plaintiff's "medically determinable mental impairments of depression and bipolar disorder,

While Plaintiff claims the ALJ failed to account for Plaintiff's non-severe mental impairments when formulating the RFC, the record indicates otherwise.  First, the ALJ noted that the degree of limitation present as part of his "paragraph B" findings, concerning the four functional areas set out in section 12.00C of the Listing of Impairments discussed at Step 2, were reflected in his RFC assessment in Steps 4 and 5.  (Tr. at 24; see also id. at 23 (finding Plaintiff had only a mild limitation in the functional areas of daily living, social functioning, and concentration, persistence, or pace, as well as no repeated episodes of decompensation).)  At Step 4, the ALJ assigned Plaintiff an RFC for "unskilled" work, which at the very least requires "the psychological capacity to understand, remember and carry out simple instructions, and to respond appropriately to supervisors, co-workers, and workplace routines … on a regular and continuing basis, eight hours a day, five days a week, or on an equivalent schedule.  (Id. at 25, 31 (citing SSR 96-9p; SSR 96-8p); see also Tr. at 23 (concluding, at Step 2, that Plaintiff's mental impairments "[did] not cause more than minimal limitation in the [Plaintiff's] ability to perform basic mental work activities").)  The record does not indicate that the ALJ "disregarded the impact of Plaintiff's mental impairments," (Pl.'s Br. at 19), but found those impairments to be mild, having only a minimal effect on Plaintiff's ability to perform mental work activities.

---

considered singly and in combination, do not cause more than minimal limitation in the [Plaintiff's] ability to perform basic mental work activities and are therefore nonsevere."  (Id. at 23.)

In finding that Plaintiff's mental impairments did not cause more than minimal limitation on her ability to perform basic mental work activities, the ALJ considered the four functional areas set out in section 12.00C of the Listing of Impairments.  (Id.; see 20 C.F.R., Part 404, Subpart P, App'x 1.)  He determined Plaintiff had only a mild limitation in the functional areas of daily living, social functioning, and concentration, persistence, or pace, based on Plaintiff's subjective statements and evidence from her examination with Dr. Seifer in 2010.  (Tr. at 23.)  In the fourth functional area, the ALJ found that, despite one or two episodes of decompensation that might have lasted for an extended duration, she did not have repeated episodes of decompensation.  (Id.)  Based on these findings, the ALJ determined that Plaintiff's medically determinable impairments were non-severe.  (Id. (citing § 404.1520a(d)(1)).)

The Court finds that the ALJ conclusion is supported by substantial evidence, and a reasonable mind might accept this evidence in support of his determination.  See Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 545 (3d Cir. 2003).

Accordingly, the ALJ's decision to assign Plaintiff an RFC for "unskilled" work was not in error, and was supported by substantial evidence on the record.  See SSR 96-9p (describing unskilled work as generally requiring "understanding, remembering, and carrying out simple instructions … making judgments that are commensurate with the functions of unskilled work—i.e., simple work-related decisions … responding appropriately to supervision, co-workers and usual work situations …. dealing with changes in a routine work setting.")

### iii.   The ALJ Properly Determined that Plaintiff Could Perform Her Past Relevant Work

Plaintiff further alleges the ALJ erred at Step 4 by failing to define what was meant by "unskilled work" within the context of his RFC determination.  (Pl.'s Br. at 20-22.)  In failing to properly define the term "unskilled work," Plaintiff argues that either the ALJ's finding that Plaintiff could return to past work as a cashier was unsupported, or the ALJ failed to articulate specific cognitive limitations on a function-by-function basis to support his restriction to "unskilled work."  (Id.)

Plaintiff's first argument requires the Court to follow a somewhat circuitous logical path.  First, the Plaintiff notes that the ALJ determined she had the RFC to perform "unskilled … work."  (Tr. at 25.)  According to Plaintiff, the ALJ "failed to define 'unskilled work.'"  (Pl.'s Br. at 20.)  However, the Court notes that the ALJ did state that, at the very least, an RFC for "unskilled work" requires "the psychological capacity to understand, remember, and carry out simple instructions, and to respond appropriately to supervisors, co-works, and workplace routines."  (Tr. at 31 (citing SSR 96-8p).)  Plaintiff goes on to argue that, because the description of her past relevant position, that of a cashier, contained a GED Reasoning Level 3, the ALJ's

conclusion that she could perform her past relevant work was inconsistent with her RFC for "unskilled work."  (Pl.'s Br. at 20-21.)[14]

Plaintiff first directs the Court's attention to the Social Security Program Operations Manual System ("POMS") DI 25020.010 (effective Sept. 14, 2012), available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010, which describes the basic demands of "unskilled work" as including the ability to "understand, carry out, and remember simple instructions; make judgments that are commensurate with the functions of unskilled work, i.e., simple work-related decisions; respond appropriately to supervision, coworkers and work situations; and deal with changes in a routine work setting."  Id.  Next Plaintiff points to 20 C.F.R. § 404.1568(a), which describes "unskilled work" as that which "needs little or no judgment to do simple duties that can be learned on the job in a short period of time … and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed."  Id.  Based on the language in the POMS and the regulations, Plaintiff argues the ALJ's finding that Plaintiff can perform her past work as a cashier is in conflict with the definition of "unskilled work."  (Pl.'s Br. at 21.)  She contends that by limiting her to "unskilled work," she must be restricted to work that is only classified with a GED Reasoning Level 1, which would preclude her from working as a cashier.  (Id.)[15]  She attempts further

---

[14] The Dictionary of Occupational Titles ("DOT") describes a cashier as a "light work" job that generally requires Reasoning at a GED Level 3, Math at a GED Level 2, Language at a GED Level 2, the ability to write compound and complex sentences, the ability to speak distinctly and clearly, and a Specific Vocational Preparation ("SVP") Level 2.  U.S. Dept. of Labor, Dictionary of Occupational Titles, 211.462.010, 1991 WL 671840 (4th ed. rev. 1991)

[15] The GED component of the DOT is broken up into three parts: reasoning development, mathematical development, and language development.  See Dictionary of Occupational Titles, App'x C, 1991 WL 688702.

A GED Reasoning Level 3 requires the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations."  Id.  GED Reasoning Levels 2 and 1 require, respectively, the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations," and "[a]pply commonsense understanding to carry out simple one- or two-step instructions.  Deal with standardized situations with occasional or no variables in or from these situations encountered on the job."  Id.

support for her argument by reference to a Social Security Administration Memorandum from

December 2008, which states

> Information we do not use in our disability adjudications,
> [includes]:
> …
>
> DOT ratings for General Educational Development (GED).  We do
> not rely on these ratings to conclude whether a claimant can
> perform a particular occupation when we cite occupations that
> demonstrate the ability to do other work.  However, adjudicators
> should consider GED ratings that may appear to conflict with the
> claimant's RFC and the cited occupation(s); for example, an
> occupation with a GED reasoning level of 3 or higher for a
> claimant who is limited to performing simple, routine, or unskilled
> tasks.  (See POMS DI 25015.030)

Memo 09-2139, "Use of Electronic Occupational References for Administrative Law Judge and

Senior Adjudicator Decisions – UPDATE," Social Security Administration (Dec. 28, 2009),

available at http://www.skilltran.com/ssa_2009_ElectronicReferences.pdf.  She contends that

this memorandum makes clear the ALJ was not free to ignore the corresponding GED Reasoning

Level 3 designation for the job of cashier, and the ALJ was not permitted to give lesser weight to

---

A GED Math Level 2 requires the ability to "[a]dd, subtract, multiply, and divide all units of measure.  Perform the four operations with like common and decimal fractions.  Compute ratio, rate, and percent.  Draw and interpret bar graphs.  Perform arithmetic operations involving all American monetary units."  Id.  A GED Math Level 1 requires the ability to "[a]dd and subtract two-digit numbers.  Multiply and divide 10's and 100's by 2, 3, 4, 5.  Perform the four basic arithmetic operations with coins as part of a dollar.  Perform operations with units such as cup, pint, and quart; inch, foot, and yard; and ounce and pound."  Id.

A GED Language Level 2 requires a "[p]assive vocabulary of 5,000-6,000 words," and the ability to "[r]ead at rate of 190-215 words per minute.  Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation.  Read instructions for assembling model cars and airplanes. … Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs. … Speak clearly and distinctly with appropriate pauses and emphasis, correct punctuation, variations in word order, using present, perfect, and future tenses."  Id.  Additionally, a GED Language Level 1 requires the ability to "Recognize meaning of 2,500 (two- or three-syllable) words.  Read at rate of 95-120 words per minute.  Compare similarities and differences between words and between series of numbers. … Print simple sentences containing subject, verb, and object, and series of numbers, names, and addresses. … Speak simple sentences, using normal word order, and present and past tenses."  Id.

some parts of the DOT definition versus others.  (Pl.'s Br. at 21-22.)  Despite Plaintiff's

somewhat intricate argument, this Court does not agree.

The Court notes first that the regulations require that Plaintiff prove she could not

continue doing her past relevant work at Step 4, see 20 C.F.R. § 404.1520(f); see also Doak v.

Heckler, 790 F.2d 26, 28 (3d Cir. 1986) ("In prosecuting a disability claim, the claimant's initial

burden is to demonstrate the existence of a medically determinable disability which precludes

resumption of previous employment."), which the ALJ was to decide by comparing his RFC

assessment with the physical and mental demands of Plaintiff's past relevant work.  §

404.1520(f).  In making this comparison, the ALJ was to consider Plaintiff's gainful activity

from the past fifteen years, and could consult Plaintiff's own descriptions of her past

employment, other individuals who knew about her past work, and other resources, such as the

DOT, to obtain evidence to help him determine whether Plaintiff can do her past relevant work,

given her RFC.  § 404.1460(b)(1)-(2).  Notably, while the DOT is routinely applied by ALJs in

determining what jobs a claimant may be qualified for in light of a particular RFC, the DOT

descriptions "[list the] maximum requirements of occupations as generally performed, not the

range of requirements of a particular job as it is performed in specific settings."  SSR 00-4p.

Moreover, the skill level component of an RFC generally correspond to the Specific Vocational

Preparation levels listed in the DOT,[16] as "[a] skill is knowledge of a work activity that requires

the exercise of significant judgment that goes beyond the carrying out of simple job duties and is

acquired through performance of an occupation that is above the unskilled level (requires more

---

[16] The DOT also defines various Specific Vocational Preparation ("SVP") levels.  "Specific Vocational Preparation
is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information,
and develop the facility needed for average performance in a specific job-worker situation."  Dictionary of
Occupational Titles, App'x C, 1991 WL 688702.  An SVP Level 2 includes "[a]nything beyond short demonstration
up to and including 1 month."  Id.

than 30 days to learn)." Id. (emphasis added) (citing SSR 82-41).  Accordingly, "[u]sing the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2." SSR 00-4p.  That same policy interpretation states that, although "there may be a reason for classifying an occupation's skill level differently than in the DOT, the regulatory definitions of skill levels are controlling."  Id.

In this case, the ALJ noted that Plaintiff had past relevant work as a gift shop cashier, which is unskilled and light work as designated by the DOT.  (Tr. at 36.) The ALJ further found, in comparing Plaintiff's RFC with the physical and mental demands of her past work as a gift shop cashier, that she was able to perform the job as it generally would be performed.  (Id.)  He noted that the job did not require that Plaintiff "be exposed to environmental conditions aside from moderate limitations in noise levels."  (Id.)  Nor did the job requirements involve any postural demands, though it did require frequent reaching, handling, fingering, talking, hearing and near acuity.  (Id.)  Based on this description, the ALJ found that none of the limitations was in conflict with Plaintiff's RFC as assigned, and he concluded that she could perform the work of a cashier as it was generally performed.  (Id.)

The Court finds the ALJ's determination that the cashier position fit plaintiff's RFC for unskilled work was supported by substantial evidence.  According to the December 2008 memorandum cited by Plaintiffs, it would be appropriate to consider the GED ratings and resolve a conflict if there appeared to be a conflict, but it was reasonable for the ALJ in this case to consider no such conflict as existing.  First, § 404.1568(a) describes "unskilled work" as that which "needs little or no judgment to do simple duties that can be learned on the job in a short period of time … and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed."  Id.  The DOT description of the cashier job

assigned it an SVP level 2, which the policy interpretations indicate equates with unskilled work. See SSR 00-4p.  In other words, the finding that Plaintiff could perform past relevant work, which the regulations consider unskilled work, was not in error.

The remaining consideration is whether the GED Reasoning Level described in the DOT for the job of cashier appeared to conflict with the ALJ's RFC determination.  The Court briefly mentions two points noted above:  (1) the DOT description indicates the maximum requirements for a given occupation, see SSR 00-4p, and (2) the ALJ did not find that Plaintiff could only understand, remember, and carry out simple instructions, but rather that she could, at a minimum, do so in order to qualify for unskilled work.  (See Tr. at 31 (citing 96-9p).)  Plaintiff points to nothing on the record or in the case law that suggests the ALJ failed to resolve an actual conflict by taking into account the GED Reasoning Level.  The example cited in the December 2008 memorandum is insufficient to conclude that the GED Reasoning Level 3 in the DOT description necessarily "precludes the Plaintiff from performing" work as a cashier.  (Pl.'s Rep. Br. at 8.)  The ALJ never found that Plaintiff's RFC assessment for "unskilled work" was based on anything more than the fact that she matched the requirements of § 404.1568(a), which is the standard definition for "unskilled work," and requires "little or no judgment to do simple duties that can be learned on the job in a short period of time … and a person can usually learn to do the job in 30 days."  Id.  Without more, there is no apparent conflict for the ALJ to resolve.  The Court has already determined, supra, that the ALJ properly explained his reasons for the RFC assigned, and his decision was based on substantial evidence.  Here, the ALJ properly concluded that the cashier position fit Plaintiff's RFC for "unskilled, light work" at Step 4, and this finding is supported both by substantial evidence on the record and the applicable regulations and guidance materials.

Because the Court finds the ALJ did not err in his determination that Plaintiff was capable of performing her past relevant work as a cashier, in light of her RFC for "unskilled work," and the various regulations, definitions, and guidance applicable to an RFC for "unskilled work," it need not address whether the ALJ properly articulated the functional limitations associated with an RFC for "unskilled work" on a function-by-function basis.  Based on the foregoing, the Court finds that the ALJ did not err at Step 4 in his assessment of Plaintiff's RFC and his determination that Plaintiff could perform her past relevant work as a gift shop cashier, as these conclusions were based on substantial evidence.

**IV.    CONCLUSION**

For the reasons discussed above, the decision of the Commissioner is **AFFIRMED**.  An appropriate Order shall enter today.


Date:   12/12/2014                                    s/ Robert B. Kugler
                                                      ROBERT B. KUGLER
                                                      United States District Judge